# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | | |
|---|---|---|
| JUAN BARBOZA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17 C 50002 |
| | ) | |
| JAMES A. CARUSO, BESSIE S. DOMINGUEZ, | ) | |
| SUSAN M. TUELL, JAMIE A. MAGNAFICI | ) | Judge Thomas M. Durkin |
| (A.K.A. JAMIE A. MONK), AND | ) | |
| JANE DOE NURSES, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Juan Barboza, an inmate in the custody of the Illinois Department of Corrections ("IDOC") at Dixon Correctional Center who is represented by counsel, brings this action under 42 U.S.C. § 1983 alleging that he received constitutionally inadequate medical care for a spider bite. Each of the individual defendants (collectively, "Defendants") nurse practitioner Susan M. Tuell, physician assistant James A. Caruso, Bessie S. Dominguez, M.D., and registered nurse Jamie A. Magnafici (Magnafici also known as "Jamie A. Monk" and referred to hereafter as "Monk") moved for summary judgment.[1] R; 137; R. 141; R. 145; R. 149. For the following reasons, Defendants' respective motions are granted.

---

[1] Defendants are each employed through Wexford Health Sources, Inc., which itself was dismissed from this lawsuit by order dated May 30, 2018. R. 88.

## Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Local Rule 56.1

As an initial matter, the Court notes that Barboza's submissions in opposition to Defendants' motions violate the applicable summary judgment rules. Specifically, while Barboza submitted the IDOC's nursing treatment protocols and certain of Barboza's treatment records from Katherine Shaw Bethea ("KSB") Hospital as additional evidence in this case, in contravention of Local Rule 56.1(b)(3)(C), Barboza failed to submit a statement of additional facts to which Defendants could be expected to respond. Instead, Barboza included only a "Factual Background" section within his response brief that cites both to his responses to Defendants' statements of fact and

to the additional evidence he submitted. *See Cichon v. Exelon Generation Co., LLC*, 401 F.3d 803, 809 (7th Cir. 2005) ("Local Rule 56.1 *requires specifically* that a litigant seeking to oppose a motion for summary judgment file a response that contains a separate statement . . . of any additional facts that require the denial of summary judgment.") (emphasis in original). Accordingly, the Court need not consider Barboza's additional facts. *See Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) ("Simply providing additional facts in one's responsive memorandum is insufficient to put those facts before the Court."). But as explained below, even if the Court considers the totality of Barboza's submissions, summary judgment is proper for Defendants.

## Background

This action arises over treatment Barboza received after he was bitten by a spider and developed an infection, and his ongoing complaints of pain, numbness and paralysis that he contends resulted therefrom. The following facts are undisputed unless otherwise noted.

Barboza is and was in the custody of the IDOC at all times relevant to this lawsuit. On October 11, 2015, Barboza told a nurse that a spider bit him a few hours earlier. The nurse—who is not a party to the case—completed a "Bite Form." R. 156 ¶¶ 8-10. She indicated that Barboza suffered from pain, swelling, and redness, and circled the pre-printed words "Refer to MD" on the form. *Id.* ¶ 11; R. 143, Ex. 10. The nurse then referred Barboza to Caruso, a physician assistant, whom Barboza saw a few minutes later. R. 156 ¶¶ 9, 16.

3

Barboza told Caruso that a spider bit him, and that he both saw and killed the spider. *Id.* ¶ 13. Caruso charted that Barboza's right foot was red, hot, and swollen with a "central lesion," and assessed the condition as due to an "Insect bite." He prescribed an anti-inflammatory steroid, antihistamine, and Motrin, and directed Barboza to follow up as needed. *Id.* ¶¶ 16, 19. Both the Bite Form and relevant IDOC nursing treatment protocol direct: "All reported 'spider bites' treat as MRSA." *Id.* ¶ 10; R. 143, Ex. 10; R. 159, Ex. A at 23. "MRSA" stands for Methicillin-resistant Staphylococcus aureus, a type of skin infection that is treated with antibiotics and can present similarly to an insect or spider bite. R. 143, Ex. 8; R. 156 ¶ 20.

Three days later on October 14, 2015, Barboza saw nurse practitioner Tuell and told her that he had been bitten by a spider, and was not on antibiotics. R. 155 ¶ 17. Tuell noted that Barboza's right foot was swollen and "extremely painful to touch," and that there was a small pustule on his fourth toe. She noted surrounding redness "up into ½ of foot" and a small amount of purulent material. *Id.* Tuell diagnosed Barboza with a spider bite and cellulitis, a bacterial skin infection. *Id.* She ordered a wound culture, daily dressing changes to allow monitoring and ensure the site stayed clean and dry, a topical antibiotic to help the skin heal, and a bottom bunk for one month. *Id.* ¶¶ 17, 19-20. She also prescribed Bactrim DS (an antibiotic) by mouth for 10 days and tramadol for pain, continued Barboza's Motrin, and told him to limit his activity and elevate his foot. She offered crutches to prevent swelling and spreading of infection, which Barboza refused, and instructed Barboza to follow up on October 19 or sooner. *Id.* ¶¶ 17, 20, 22.

4

Barboza was seen by a licensed practical nurse the next day for a dressing change. *Id.* ¶ 31. Swelling and alteration in the skin integrity were noted, as was the plan to change his dressing "as ordered" and observe for infection. *Id.*; R. 139, Ex. 10. No subjective complaints were noted, and there is no evidence to suggest that Tuell was advised of any need to follow up with Barboza at that time. R. 155 ¶ 31.

The next day, October 16, Barboza was seen by registered nurse Monk for another dressing change. R. 158 ¶¶ 7, 23. Monk did not review Barboza's chart, but changed his dressing as directed in his order. *Id.* ¶ 24. Barboza maintains that he asked Monk for a referral to see a doctor that day and that she did not provide one. But according to Monk, if he had asked or if she felt he needed a referral, she would have noted it in his chart and consulted with a provider. *Id.* ¶¶ 32-33. The record contains no such note. Instead, Monk charted a spider bite, clear yellow liquid drainage and edema, and that Barboza's wound was red and very tender to the touch. *Id.* ¶ 36. Monk indicated the plan to monitor for increased drainage or swelling. *Id.*

Tuell saw Barboza again on October 17. R. 155 ¶ 22. Barboza reported that he he'd run over his already-injured foot with a property cart two days prior, *id.* ¶ 33, an injury that could cause swelling, warmth and tissue damage, *id.* ¶ 35. Tuell noted an increase in warmth and swelling, edema and redness "up to foot," purulent discharge, but intact circulation and sensation. *Id.* ¶¶ 33, 42. Still awaiting the results of Barboza's wound culture, she continued Barboza's Bactrim DS and gave him an injection of penicillin, instructing him to follow up the next day. *Id.* ¶¶ 33, 36.

5

When Barboza returned the next day, Tuell noted intact circulation and sensation, but increased swelling and drainage and worsening cellulitis with "copious amounts of purulent discharge from right foot abscess." *Id.* ¶ 40. She referred Barboza to KSB Hospital for management and "possible debridement." *Id.*

Once there, Barboza was treated by David Yeager, M.D. (surgeon), and Abdulhamid Alkhalaf, M.D. (infectious disease) for infection secondary to a spider bite. Dr. Yeager noted two open lesions on Barboza's fourth toe, and recommended surgery that day involving incision, drainage and debridement of all nonviable soft tissue and bone. R. 139, Ex. 11. Dr. Yeager advised Barboza of the risks of the procedure, including "damage to the nervous system." And Dr. Alkhalaf prescribed two new antibiotics—vancomycin and meropenem. *Id.* Barboza was discharged two days after his surgery, which ultimately was limited to incision and drainage of the wound. *Id.* At discharge, his cultures had returned positive for Methicillin-Susceptible Staphlyococcus Aureas (MSSA). *Id.*; R. 155 ¶ 68. Dr. Alkhalaf again switched Barboza's antibiotic—this time to cephalexin—to better attack the specific bacteria identified. R. 139, Ex. 11. No nerve issues or reports of numbness, tingling, weakness, or restricted movement or paralysis were documented during Barboza's KSB Hospital admission or at the time of his discharge. R. 155 ¶¶ 45-48.

Thereafter, Barboza was admitted to Dixon's infirmary, where he remained until his November 6, 2015 follow-up appointment with Dr. Yeager. Dr. Yeager noted that Barboza was "doing well" and that his neurological system was "grossly intact." He recorded no complaints from Barboza about decreased range of motion in his toe

6

or difficulty walking. *Id.* ¶ 50; R. 157 ¶ 34. His paperwork with the Dixon infirmary physician that day (and prior) likewise reflects no sensory deficit or paralysis, and on November 6, 2015, cleared Barboza to return to normal activities. R. 155 ¶¶ 56-57; R. 139, Ex. 6 at 35; R. 157 ¶¶ 24-26, 28, 31-32.

In February 2016, three-and-a-half months after his surgery, Barboza saw Dr. Dominguez for his annual physical examination. R. 157 ¶ 41. Dr. Dominguez noted Barboza's complaints of numbness and that he was unable to move his right fourth toe because of his infection and surgery. *Id.* ¶¶ 45, 48. Her notes do not reflect any report of pain. *Id.* ¶ 49. She did not order physical therapy or rehabilitative care, and did not schedule any follow up appointments. The parties dispute whether Barboza asked for such care or appointment, and further dispute whether Dr. Dominguez told Barboza to make a "sick visit" appointment to address his concerns if he did. *Id.* ¶¶ 57, 59. But the evidence does not reflect that any request for such an appointment was made until on or around January 31, 2017, when Barboza was seen by a nurse practitioner for nerve pain "coming up from [his] foot that had infection and going into [his] Rt. buttock & back," and "tingling" in his right foot. *Id.* ¶ 58. The NP noted that Barboza had lifted heavy weights in the past and continued to lift weights, and had previously had a "significant foot infection." Her assessment that day was low back strain and radiculopathy. *Id.* ¶ 58; R. 147, Ex. 10. For his part, Barboza maintains that since his infection and subsequent surgery, he has experienced pain, numbness and paralysis in his toe which has caused a limp, all due to Defendants' delayed treatment. R. 157 ¶ 69.

In their respective motions for summary judgment, Defendants argue that the steps taken at each stage of Barboza's care were reasonable and well within the standard of care based on Barboza's report of a spider bite and subsequent signs of infection. In support, Defendants point to the report and testimony of their expert, Board-Certified Internist James H. Cohn, M.D., and to the relative lack of evidence from Barboza to the contrary (including that of an expert). In response, Barboza argues that the medical records and subsequent surgery alone make clear that Defendants failed to follow IDOC protocol for spider bites and cellulitis and that their delay in prescribing antibiotics and referring him to a medical doctor and outside hospital constituted deliberate indifference.

**Analysis**

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display deliberate indifference to serious medical needs of prisoners." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008). To survive summary judgment on a deliberate indifference claim, a plaintiff "must satisfy two elements, one objective and one subjective." *McGee v. Adams*, 721 F.3d 474, 480 (7th Cir. 2013). To satisfy the objective element, a plaintiff must "present evidence supporting the conclusion that he had an objectively serious medical need." *Id.* And to satisfy the subjective element, a plaintiff must present evidence demonstrating that "defendants were aware of his serious medical need and were deliberately indifferent to it." *Id.* In turn, to establish deliberate indifference, a plaintiff must

8

"meet essentially a criminal recklessness standard, that is, ignoring a known risk." *Id.* at 481.

Medical malpractice or a disagreement with a doctor's medical judgment does not give rise to a constitutional claim for deliberate indifference. *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007); *Gayton v. McCoy*, 593 F.3d 610, 622-23 (7th Cir. 2010). Nor is an inmate entitled to "demand specific care" or the "best care possible." *Forbes v. Edgar*, 112 F.3d 262, 266-67 (7th Cir. 1997). But a prison doctor may exhibit deliberate indifference to a known condition: (1) "through inaction," (2) "by persisting with inappropriate treatment," or (3) "by delaying necessary treatment and thus aggravating the injury or needlessly prolonging an inmate's pain." *Gatson v. Ghosh*, 498 Fed. Appx. 629, 631-32 (7th Cir. 2012) (citations omitted). Where prison officials have delayed rather than denied medical assistance to an inmate, "courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm." *Williams v. Liefer*, 491 F.3d 710, 714-15 (7th Cir. 2007). And if an inmate alleges that a particular treatment decision was erroneous, "[d]eliberate indifference may be inferred . . . only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Gayton*, 593 F.3d at 622-23. The Court discusses the evidence as to each Defendant in light of these standards.

***Physician Assistant Caruso.*** Barboza argues that Caruso was deliberately indifferent in delaying treatment for a staph infection. He points to the IDOC Bite Form and nursing treatment protocol for bites as evidence that Caruso should have treated his spider bite as MRSA (and immediately prescribed an antibiotic), and referred him to an M.D. on the single day that he saw him.

The Court doubts that Barboza's wound constituted a "serious medical need" hours after it occurred (even while it acknowledges that it became one later). *See Fryer v. Ledvora*, 2017 WL 36445, at *5 (N.D. Ill. Jan. 4, 2017) ("[c]ourts have been reluctant to hold that a spider bite is a serious medical need") (collecting cases). But even if it did, Caruso's treatment of Barboza just once—hours after he reported the bite—was in no way deliberately indifferent. It is undisputed that Barboza told Caruso that he saw and killed the spider that bit him. And Defendants' expert Dr. Cohn approved Caruso's course of treatment—anti-inflammatory steroids, antihistamines and pain medications, and the directive to return as needed—as reasonable and in keeping with standard practice for a patient presenting with a definitive spider bite. R. 143 ¶¶ 20-22; *id.*, Ex. 3 at 102-103; *id.*, Ex. 8 at 3; *id.*, Ex. 9 at 37-38. That opinion is unrefuted by any expert of Barboza's own. Further, the Court is not convinced that the Bite Form and IDOC nursing treatment protocol help Barboza, either. Both direct that "spider bites" (in quotes) should be treated as MRSA. But as Dr. Cohn explained (and as the quotation marks around the words "spider bite" could reasonably be interpreted to mean), treatment of an alleged spider bite as MRSA may be appropriate when the "practitioner isn't sure whether a patient was

10

really bitten by a spider." But it is not, as here, when there is no need for the practitioner to "guess whether there was a spider bite." In fact, according to Dr. Cohn, it is "rare that a spider bite . . . would lead to infection" at all, and "not common practice or the standard of care to treat insect bites or spider bites with antibiotics on the first date of the bite." R. 143, Ex. 8 at 3.

Nor is it clear that the IDOC nursing treatment protocols applied to Caruso in any case. By their terms, the protocols are used by nurses and CMTs as guidelines (not physician assistants or nurse practitioners). *See* R. 159, Ex. A at 6. And it is undisputed that Barboza never had MRSA in the first place. Accordingly, on these facts, Caruso's purported failure to follow protocol—even assuming it applied to him—was not "so dangerous" that the deliberate nature of his conduct can be inferred. *See Gayton*, 593 F.3d at 623 (deliberate indifference question was not proper for jury where nurse took measures that were "reasonable" even though she did not follow protocol).

The fact that the nurse circled "Refer to M.D." on the Bite Form likewise does not change matters. Both Caruso and Tuell testified that "M.D." for these purposes includes not only medical doctors, but also physician assistants (like Caruso) and nurse practitioners (like Tuell). R. 156, Ex. 8 at 2. All such providers are licensed and able to treat spider bites and skin infections and prescribe medication. *Id.* And the IDOC nursing treatment protocols are in accord. *See* R. 159, Ex. A at 6 (introductory language stating that "[r]eferral to a physician, physician's assistant (PA), or nurse practitioner (NP) should always occur as indicated in the protocol"); *see also id.* at 23

11

("Bites" protocol indicating the "plan" to refer bites to "MD/PA/NP" "stat," and, in the case of insect or spider bites in particular, "[i]f MRSA suspected refer to provider"). Therefore, not only was Caruso's treatment prompt and reasonable, but also it was within the applicable standard of care for Caruso himself to provide it. Barboza has failed to create a genuine issue for trial as to Caruso's alleged deliberate indifference, so summary judgment is proper.

*Nurse Practitioner Tuell.* Barboza's claim that nurse practitioner Tuell was deliberately indifferent in her delayed treatment fails for similar reasons. The very first day that Barboza presented to her, Tuell prescribed Bactrim DS and took wound cultures. Bactrim DS was identified by both Dr. Cohn and infectious disease specialist Dr. Alkhalaf as an excellent choice for an initial antibiotic treatment due to its broad coverage against a wide variety of bacteria—including both MSSA and MRSA. R. 139, Ex. 5 at 18-20, 84; *id.*, Ex. 8 at 4. And as Barboza himself admits, the wound cultures in this case indicated that Bactrim DS actually "had activity against [Barboza's] infection." R. 155 ¶ 28. That first day, Tuell also provided pain medication, ordered daily dressing changes and a bottom bunk, and offered crutches (which, as noted, Caruso refused). Barboza argues that Tuell should have referred Barboza to a medical doctor upon diagnosing him with cellulitis in accordance with the IDOC nursing treatment protocol. But the protocol he cites specifically states as to cellulitis "MD/PA/NP Referral – Always," R. 159, Ex. A at 79, and Tuell herself is a nurse practitioner. Moreover, according to Dr. Cohn, Tuell's treatment plan that day "was what any qualified practitioner would have recommended." R. 139, Ex. 8 at 4. No

reasonable jury could conclude that Tuell's plan was a "substantial departure from accepted professional judgment" so as to constitute deliberate indifference. *Gayton*, 593 F.3d at 623.

Nor can Barboza point to any evidence that Tuell's treatment three days later was deliberately indifferent. On October 17, the results of his wound culture were not yet available. But because Barboza's cellulitis persisted, and notwithstanding that Barboza also admitted to having since driven a property cart over the same foot, Tuell also administered intramuscular penicillin, in addition to continuing his Bactrim DS, and instructed Barboza to return the next day. As before, Dr. Cohn concluded that Tuell's actions were reasonable and within the standard of care. R. 139, Ex. 8 at 5. And Barboza himself admits that it takes time for an antibiotic to demonstrate its impact, so continuing the Bactrim DS was appropriate. *Id.*; R. 155 ¶ 57.

Dr. Cohn also agreed with Tuell's October 18 decision to refer Barboza to the emergency room after charting the presence of an abscess and noting that Barboza's cellulitis had worsened and the drainage increased. He saw no need to make such a referral (or a referral to another medical provider at Dixon) any sooner that day—one week after he initially presented—and Barboza offers no evidence to the contrary. R. 139, Ex. 8 at 5. In sum, there is no evidence to suggest that anything Tuell did or failed to do caused or contributed to Barboza's injury or pain, and all of her actions were well within the standard of care. Accordingly, summary judgment is also proper for Tuell.

***Registered Nurse Monk.*** Barboza next argues that Monk was deliberately indifferent for failing to refer him to a medical doctor when she changed his dressing on October 16 in between visits with Tuell. The parties dispute whether Barboza requested that Monk refer him to a doctor. And Barboza again points to the IDOC nursing treatment protocol for cellulitis—indicating that "*Cellulitis can worsen rapidly and be very dangerous. Always refer patient to the MD*"—as evidence of Monk's deliberate indifference because she did not. R. 158 ¶ 29. But again, that protocol also indicates that treatment by a physician assistant or nurse practitioner is appropriate. And here, that treatment was ongoing (through Tuell). Moreover, while Monk did review nurse practitioner Tuell's order to change dressings, as Barboza acknowledged, Monk "knew nothing about his treatment, diagnosis, or prescriptions," and "could not recall whether she knew [Barboza] had an infection" at all. R. 154 at 11; R. 158 ¶ 17. Without evidence to the contrary, that acknowledgement alone dooms his claim. *See Farmer v. Brennan*, 511 U.S. 825, 837-38 (1994) ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."). Finally, Dr. Cohn's uncontroverted opinion is that Monk's actions—that is, correctly changing Barboza's dressing and charting his condition—were reasonable, and he found no evidence of a change in Barboza's condition that warranted notifying a more advanced medical provider. R. 151, Ex. 6 at 6. (A determination that is bolstered by the fact that Barboza saw Tuell the next day, and

Tuell did not make a referral then, either.) Accordingly, summary judgment is also proper on Barboza's claim against Monk.[2]

***Dr. Dominguez.*** Finally, Barboza contends that Dr. Dominguez was deliberately indifferent because she failed to schedule any follow-up appointments after his surgery or prescribe any rehabilitative care. But there is no evidence that Dr. Dominguez's action or inaction at Barboza's February 2016 annual physical examination—the sole date on which she examined him—caused or contributed to his condition or pain, or that she otherwise delayed or denied him necessary medical treatment.[3] Indeed, even if Barboza requested rehabilitative care during that physical, according to Dr. Cohn, physical or occupational therapy is not prescribed for a single toe. R. 139, Ex. 8 at 7. Additionally, there is no medical evidence connecting Barboza's ongoing complaints to his spider bite or prior cellulitis and/or abscess (as opposed to his radiculopathy—which Dr. Cohn opined was more likely, R. 139, Ex. 8 at 7). Accordingly, summary judgment is also proper as to Dr. Dominguez.

---

[2] Monk also argues that Barboza failed to exhaust his administrative remedies as to her because he did not specifically name her in his grievances. But such a failure is not an automatic bar to his claim. *See Maddox v. Love*, 655 F.3d 709, 722 (7th Cir. 2011) (plaintiff's failure to name defendants in grievance was a "mere technical defect"). The Court declines to dismiss Barboza's claim on this basis.

[3] Dr. Dominguez also argues that Barboza failed to exhaust his administrative remedies as to her. In response, Barboza contends that Dr. Dominguez waived the right to raise the affirmative defense. Because the Court finds that a reasonable jury could not conclude that Dr. Dominguez was deliberately indifferent in the first place, it declines to address this issue.

## Conclusion

The Court acknowledges the unfortunate nature of the events in this case, and in particular the emergency surgery that Barboza ultimately required. But even construing the facts and all reasonable inferences in Barboza's favor, there is no evidence to support the kind of wrongdoing necessary to survive summary judgment in this deliberate indifference case. To the contrary, the evidence shows that Defendants provided close monitoring and several medications (including an antibiotic recognized as an excellent choice for the treatment of both MRSA and MSSA) and services during the 7-day period between his initial complaint and his referral to an outside hospital for surgery. Despite this treatment, Barboza developed an infection, something that can happen even when proper care is provided. And there is no evidence that anything Defendants did or failed to do either before his October 2018 surgery or when Barboza presented for his annual physical examination 3-and-a-half months later caused or prolonged any injury or pain. For these reasons, the Court grants Defendants' respective motions for summary judgment, R; 137; R. 141; R. 145; R. 149. Civil case terminated.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: March 10, 2020